UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY L. MAY, *et al.*,

        Plaintiffs,

v.

PATRICIA CARUSO, *et al.*,

        Defendants.

                                        /

Case No. 1:08-cv-683

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner on behalf of himself and four minor children. This matter is now before the court on defendants' motions for summary judgment (docket nos. 21 and 28).

**I.    Background**

Plaintiffs seek relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

The plaintiffs in this action are Anthony L. May ("May"), a prisoner in the custody of the Michigan Department of Corrections ("MDOC"), and his four children identified as M.C.M., M.L.M., D.K.M. and A.S.M. Plaintiffs have named ten defendants in this action, consisting of two

MDOC administrators, six staff at the Carson City Correctional Facility (DRF), and four staff at the Saginaw Correctional Facility (SRF). The MDOC administrators named are Director Patricia Caruso and Inmate Affairs Manager Jay Armstrong. The DRF staff named are Warden Thomas K. Bell, Deputy Warden Tony Trierweiler, Grievance Coordinator S. Duncan, administrative assistant Donna Schafer, and Resident Unit Manager (RUM) Robert Mote. The SRF staff are Warden Lloyd Rapelje, former Warden Jan Trombley, Assistant Deputy Warden Susan Kohloff, Grievance Coordinator Russell Vittitow, and ARUS Kelly Buczek. Plaintiffs have sued all defendants in their official and individual capacities.

Plaintiffs set forth the following allegations. On July 19, 2006, RUM Mote advised May that his visiting privileges with his minor children were permanently disallowed, pursuant to MDOC Policy Directive 05.03.140, which provides in pertinent part that:

> . . . a minor child . . . of the prisoner shall not be approved for placement on the prisoner's approved visiting list under any of the following circumstances: . . .
>
> c.  The prisoner has been convicted of child abuse, criminal sexual conduct or any other assaultive or violent behavior against the child or sibling of the child unless an exception of has been granted by the Director upon request of the warden.

May states that he grieved this issue, with his Step I grievance being denied by defendants Schafer and Trierweiler, his Step II appeal denied by defendant Bell, and his Step III grievance denied by defendant Armstrong. On January 2, 2008, May sought an exception to the ban by submitting a request to the acting SRF Warden (not a party to this action). On January 16, 2008, the newly appointed SRF Warden, defendant Rapelje, "responded favorably" to the request and submitted a request to MDOC Director Caruso for an exception to policy directive for non-contact visits. Defendant Caruso did not respond to the request.

Plaintiffs alleged that the policy directive deprived May of: his rights under the Fifth and Fourteenth Amendment not be deprived of life, liberty or property without due process of law; his First Amendment right of association; and the Eighth Amendment right to be free from cruel and unusual punishment. Plaintiffs seek a declaratory judgment that P.D. 05.03.140 violates that First, Fifth, Eighth and Fourteenth Amendments as well as an injunction to prohibit prison officials from enforcing the policy directive against them. Plaintiffs also seek compensatory and punitive damages.

This matter is now before the court on a motion for summary judgment filed by defendants Caruso, Trierweiler, Armstrong, Duncan, Schafer, Mote, Rapelje, Buczek, Vittitow and Kohloff (docket no. 21), and, a motion for summary judgment filed by defendant Bell (docket no. 28).[1]

## II. Defendants' Motions for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for

---

[1] Defendant Trombley has not been served in this action and is not a party to any of the dispositive motions.

3

> summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Constitutional challenge

### 1. The Director's rule making authority

M.C.L. §§ 791.206(1)(a) and (d) vest the MDOC Director with the discretion to promulgate rules to provide for "[t]he control, management, and operation of the general affairs of the department," and for "[t]he management and control of state penal institutions, correctional farms, probation recovery camps, and programs for the care and supervision of youthful trainees separate and apart from persons convicted of crimes within the jurisdiction of the department." The Michigan Administrative Code ("MAC") provides that "The [MDOC] shall establish reasonable visiting hours and uniform quotas at each institution for visits to prisoners to promote order and security in the institutions and to prevent interference with institutional routine or disruption of the prisoner's programming." 1979 MAC R. 791.6607(1) (as amended). However, the MDOC has placed limits on visitation of minors:

> A child who is under the age of 18 shall not be permitted to visit if any of the any of the following provisions apply:

4

(a) The parental rights of the prisoner to the child have been terminated.

(b) There is a court order prohibiting visits between the child and the prisoner.

(c) The prisoner has been convicted of child abuse, criminal sexual conduct, or any other assaultive or violent behavior against the child or a sibling of the child, unless specific approval for the visit has been granted by the director.

1979 MAC R. 791.6609(6) (as amended).

These rules have been codified by the MDOC in PD 05.03.140, which provides that:

A proposed visitor shall be approved for placement on the prisoner's approved visitors list if all of the following criteria are met: . . . .

4. The person is 18 years of age or older, an emancipated minor, or the child, step-child, grandchild, sibling, step-sibling, or half-sibling of the prisoner. However, a minor child, step-child, grandchild, sibling, or half-sibling of the prisoner <u>shall not</u> be approved for placement on the person's approved visitors list under the following circumstances: . . . .

c. The prisoner has been convicted of child abuse, criminal sexual conduct, or any other assaultive or violent behavior against the child or sibling of the child unless an exception has been granted by the Director upon request of the Warden. The Warden will be notified in writing if an exception is granted.

PD 05.03.140 ¶ J.4.c. (eff. Oct. 1, 2007) (emphasis in original).

### 2. Discussion

Plaintiffs contend that the limitation as set forth in PD 05.03.140 ¶ J.4.c. violates their First, Fifth, Eighth and Fourteenth Amendment rights. Defendants rely on the Supreme Court's opinion in *Overton v. Bazzetta*, 539 U.S. 126 (2003), which rejected the plaintiffs' claims

5

that certain visitation restrictions set forth in a previous version of the policy directive violated their rights under the First, Eighth and Fourteenth Amendments. *Overton*, 539 U.S. at 128-37.

In *Overton*, the Supreme Court summarized the history of the MDOC's visitation restrictions as follows:

> The population of Michigan's prisons increased in the early 1990's. More inmates brought more visitors, straining the resources available for prison supervision and control. In particular, prison officials found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs. Special problems were encountered with the increase in visits by children, who are at risk of seeing or hearing harmful conduct during visits and must be supervised with special care in prison visitation facilities.
>
> The incidence of substance abuse in the State's prisons also increased in this period. Drug and alcohol abuse by prisoners is unlawful and a direct threat to legitimate objectives of the corrections system, including rehabilitation, the maintenance of basic order, and the prevention of violence in the prisons.
>
> In response to these concerns, the Michigan Department of Corrections (MDOC or Department) revised its prison visitation policies in 1995, promulgating the regulations here at issue. One aspect of the Department's approach was to limit the visitors a prisoner is eligible to receive, in order to decrease the total number of visitors.

*Overton*, 539 U.S. 126, 129-30.

The Supreme Court determined that the MDOC could restrict visitation, because there was a rational relation between the regulations restricting visitation and legitimate penological interests under *Turner v. Safley*, 482 U.S. 78 (1987). *Id.* at 131-32. "In *Turner* we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on

guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Id.* at 132.

In applying the first *Turner* factor, the court found that the visitation restriction served a legitimate governmental purpose:

> Turning to the restrictions on visitation by children, we conclude that the regulations bear a rational relation to MDOC's valid interests in maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from accidental injury. The regulations promote internal security, perhaps the most legitimate of penological goals, by reducing the total number of visitors and by limiting the disruption caused by children in particular. Protecting children from harm is also a legitimate goal. The logical connection between this interest and the regulations is demonstrated by trial testimony that reducing the number of children allows guards to supervise them better to ensure their safety and to minimize the disruptions they cause within the visiting areas. . . .
>
> Respondents argue that excluding minor nieces and nephews and children as to whom parental rights have been terminated bears no rational relationship to these penological interests. We reject this contention, and in all events it would not suffice to invalidate the regulations as to all noncontact visits. To reduce the number of child visitors, a line must be drawn, and the categories set out by these regulations are reasonable. Visits are allowed between an inmate and those children closest to him or her-children, grandchildren, and siblings. The prohibition on visitation by children as to whom the inmate no longer has parental rights is simply a recognition by prison administrators of a status determination made in other official proceedings.

*Id.* at 133 (citations omitted).

In reviewing the second *Turner* factor, the court found that the prisoners had an alternative means to exercise the asserted right:

> Having determined that each of the challenged regulations bears a rational relationship to a legitimate penological interest, we consider whether inmates have alternative means of exercising the constitutional right they seek to assert. Were it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable. That showing, however, cannot be made. Respondents here do have alternative means of associating with those prohibited from visiting. As was the case in *Pell*, inmates can communicate with those who may not visit by sending messages through those who are allowed to visit. Although this option is not available to inmates barred all

7

> visitation after two violations, they and other inmates may communicate with persons outside the prison by letter and telephone. Respondents protest that letter writing is inadequate for illiterate inmates and for communications with young children. They say, too, that phone calls are brief and expensive, so that these alternatives are not sufficient. Alternatives to visitation need not be ideal, however; they need only be available. Here, the alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn.

*Id.* at 135 (citations omitted).

The Supreme Court also found that the visitation regulation met the third *Turner* factor:

> Another relevant consideration is the impact that accommodation of the asserted associational right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are "particularly deferential" to prison administrators' regulatory judgments.

*Id.* at 135 (citations omitted).

With respect to the fourth *Turner* factor, i.e., the presence of ready alternatives, the court found as follows:

> Finally, we consider whether the presence of ready alternatives undermines the reasonableness of the regulations. *Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal. Respondents have not suggested alternatives meeting this high standard for any of the regulations at issue.

*Id.* at 136 (citations omitted).

The Supreme Court's reasoning in *Overton*, which concluded that certain restrictions for child visitors served a legitimate penological interest under the *Turner* test, applies with equal relevance to the child visitation restrictions as set forth in PD 05.03.140 J.4.c. May has been

8

convicted of third-degree criminal sexual conduct with one of his children. The state has a legitimate penological interest in limiting plaintiff's contact with his other children. In addition, this is not a permanent ban on all of visitation for May.² Rather, it prevents him from seeing a narrow group of visitors, i.e., siblings of the child whom he is convicted of abusing. Furthermore, as the record demonstrates, May retained the right to request an exception to this visitation restriction. Accordingly, plaintiff's constitutional challenge should be denied.

### C. Eleventh Amendment Immunity

Plaintiffs have sued defendants in both their official and individual capacities. Plaintiff's § 1983 claims for monetary damages against the defendants in their official capacities are barred by Eleventh Amendment immunity. *See Will v. Department of State Police*, 491 U.S. 58, 64-71 (1989); *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) ("the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities"). Accordingly, defendants are entitled to summary judgment on these claims for damages for acts performed in their official capacities.

### D. Defendants Duncan and Buczek

Plaintiffs have not alleged any misconduct committed by Grievance Coordinator Duncan and ARUS Buczek. In order to state a cause of action against Duncan and Buczek, plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). In the

---

² The court notes that in *Overton*, the Supreme Court observed that it might reach a different conclusion if the regulation is treated as a "de facto permanent ban on all visitation for certain inmates." *See Overton*, 539 U.S. at 134.

absence of any allegations against Duncan and Buczek, there is no basis to include these defendants in this action. Accordingly, Duncan and Buczek should be dismissed from this action.

### E. Defendant Mote

Plaintiffs do not allege that RUM Mote made the decision to terminate his visitation privileges or played any role in that decision. Plaintiffs' only allegation against RUM Mote is that Mote advised May that his visiting privileges were permanently disallowed pursuant PD 05.03.140. Vicarious liability is inapplicable to § 1983 actions. *Iqbal*, 129 S.Ct. at 1948. "[A] plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution." *Id.* RUM Mote did not engage in any unconstitutional conduct. Accordingly, he should be dismissed from this action.

### F. Defendants Armstrong, Schafer, Trierweiler, Vittitow, Kohloff and Bell

Similarly, these six defendants had no personal involvement in the decision to restrict May's visitation privileges. As plaintiffs' alleged in the complaint, the only action engaged in by these defendants was to respond to May's grievances regarding the visitation restriction imposed in 2006. "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See, e.g., Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care"). Accordingly, defendants Armstrong, Schafer, Trierweiler, Vittitow, Kohloff and Bell are entitled to summary judgment.

### G. Warden Rapelje

Similarly, plaintiff has not alleged any wrongdoing by Warden Rapelje. In a memorandum dated January 16, 2008, Warden Repelje requested that Director Caruso make an exception for May to reinstate visitation privileges:

> We have received a request from prisoner Anthony May #144974 for a Director's exception to allow visits between him and his daughter [M.C.B.]. His request is attached, along with a supporting letter from Karen Vanderlaan, M.D.
>
> Prisoner May is prohibited by policy to visit his minor children due to a conviction of Child Abuse - 3rd in April of 2000. Prisoner May was on parole at the time of the incident and pleaded Nolo Contendre in Kent County 17th Circuit Court.
>
> Prisoner May is currently serving 4th CSC-1st (14y-40y) and 3rd Flee Police 4th (1y8m-4y) [sic]. His last major misconduct was December 4, 2007 for 036 Out of Place. Prior to that date, he received four (4) major misconducts in 1 year (6/21/06 to 7/13/07). It is noted that one of the misconducts was an attempt by prisoner May to deceive the federal government by circumventing immigration laws. To his credit, he has received a positive Work Report.
>
> It is recommended that Anthony May #144974 be allowed *non-contact visits* with his minor daughter [M.C.B.].
>
> We will await your decision before taking any further action.

Docket no. 22-3 at p. 12 (emphasis in original).[3]

Director Caruso denied the request on April 1, 2008:

> I am in receipt of your communication indicating that you have received a request from prisoner Anthony May #144974, asking that he be permitted visits with his minor daughter, [M.C.B.]. Prisoner May is prohibited by policy from visiting with his minor children due to a conviction for Child Abuse - 3rd against another child of his. Prisoner May is asking to be granted an exception to policy so that he may have visits with [M.C.B.].
>
> It is noted that nowhere in the PSI is there mention of a child by the name of [M.C.B.]. Regardless, after consideration of all of the information provided,

---

[3] The court notes that May's child M.C.B. is not one of the plaintiffs in this action.

11

including a thorough review of the prisoner's history, I decline granting visits between prisoner May and any of his minor children.

Prisoner May may remain in contact with his children via telephone and written correspondence.

Docket no. 22-3 at p. 13.

Plaintiffs contend that Warden Repelje's formal request to reinstate May's visitation violated their constitutional rights. The court disagrees. By making a request on to reinstate May's visitation rights, Warden Rapelje was attempting to assist May. Plaintiffs have not alleged any misconduct on the part of Warden Rapelje, let alone a federal constitutional violation. *See Iqbal*, 129 S.Ct. at 1948-49. Accordingly, Warden Rapelje is entitled to summary judgment.

### H. Director Caruso

Finally, plaintiffs contend that Director Caruso has violated their First, Fifth, Eighth and Fourteenth Amendment rights, apparently because she relied on PD 05.03.140 and denied May's request for an exception to the visitation restriction. Defendant Caruso contends that she is entitled to qualified immunity on this claim. *See* docket no. 22 at pp. 14-15.

Qualified immunity from civil actions for damages is not a mere defense to liability, but rather absolute immunity from suit and an entitlement not to stand trial, which should be determined at the earliest possible stage in litigation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Government officials have qualified immunity from suit under § 1983 for damages arising out of the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Waeschle v. Dragovic*, -- F. 3d --, No. 08-02228, 2009 WL 2168807 (6th Cir. July 22, 2009), the Sixth Circuit explained the Supreme Court's most recent pronouncement on the issue of qualified immunity, as set forth in *Pearson v. Callahan*, 129 S. Ct. 808 (2009):

> Until recently, federal courts were required to conduct the qualified-immunity analysis using the two-step sequential inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). The first step required courts to determine "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson*, 129 S.Ct. at 816 (citations omitted). And
>
>> if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.
>
> *Id.* (citation omitted).
>
> In *Pearson*, however, the Supreme Court held that the sequential *Saucier* protocol was no longer mandatory. *Id.* at 818. The Court reasoned that
>
>> [t]he procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.

*Waeschle*, No. 08-2228, slip op. at 4-5, 2009 WL 2168807 at *2.

In this case, applying the optional two-step inquiry in *Saucier* does not pose a substantial burden on the court. Director Caruso was under no constitutional obligation to grant May's request. *See Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir. 1984) (" [p]rison inmates have no absolute constitutional right to visitation"). As the court previously discussed, the visitation restriction at issue, PD 05.03.140 ¶ J.4.c. (eff. Oct. 1, 2007), did not violate any of plaintiffs' constitutional rights. Director Caruso's only act was to make a decision denying May an exception to the restrictions imposed by that policy directive. Taken in the light most favorable to the

plaintiffs, the facts alleged do not show that the Director violated a constitutional right. Accordingly, Director Caruso is entitled to qualified immunity on this claim.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motions for summary judgment (docket nos. 21 and 28) be **GRANTED**.


Dated: July 23, 2009 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).